USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  11/19/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SUBVERSIVE TOOLS, INC.,

                Plaintiff,

-against-

BOOTSTRAP FARMER LLC,

                Defendant.

23 CV 6946 (NSR)

OPINION & ORDER

## OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff Subversive Tools, Inc., ("Subversive" or "Plaintiff") initiated this action on August 7, 2023, alleging violations of the Lanham Act, N.Y. Gen. Bus. Law § 360-1, and New York State common law against Defendant Bootstrap Farmer, LLC, ("Bootstrap or "Defendant"). (Compl., ECF No. 1.)

Presently before the Court is Bootstrap's Motion to Dismiss Subversive's operative First Amended Complaint ("FAC", ECF No. 24) pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, Bootstrap's Motion to Dismiss is GRANTED in part and DENIED in part.

## BACKGROUND

**A. Factual Background**

The following facts are derived from the FAC and are assumed to be true for the purposes of resolving the instant Motion.

Subversive is a New York corporation that designs, manufactures, and distributes agricultural propagation equipment nationwide. (FAC ¶¶ 7–9.) Among its principal products is the WINSTRIP® air-pruning tray, a reusable seed-starting system used in greenhouse cultivation and small-scale farming. (*Id.* ¶ 9.)

As background, nursery trays are three-dimensional products composed of rows of cells that hold soil and seeds to grow seedlings. (FAC ¶ 11.) Air-pruning trays, such as Subversive's WINSTRIP®, are a subset of such products designed to allow air to enter the cells—usually through open bottoms or lateral slits—so that roots near the cell edges are "pruned," encouraging healthy growth. (*Id.* ¶¶ 11–12.) For the system to function properly, the tray must be sturdy enough to support soil and seedlings while maintaining sufficient airflow to the lower and side areas of the cells, where root pruning occurs. (*Id.* ¶ 13.)

The WINSTRIP® tray consists of a grid of square planting cells separated by diamond-shaped air openings arranged diagonally across the surface. (FAC ¶ 17.) Each row of cells is angled approximately twenty-nine to thirty-one degrees relative to the tray's edges, forming a checkerboard pattern visible from above. (*Id.*) The design includes alternating cells and air spaces: the air spaces, which do not border the tray's outer walls, appear as smaller squares positioned between four larger planting cells that share common interior walls. (*Id.*) This diagonal alignment of alternating shapes creates a geometric configuration that defines the overall appearance of the WINSTRIP® tray. (*Id.* ¶ 18.) A schematic depiction of this arrangement, illustrating the relationship between the air gaps and cells that comprise the WINSTRIP® Trade Dress, appears below.

(FAC ¶ 16.)

The WINSTRIP® design originated in the mid-1990s with horticultural innovator Aart Van Wingerden, who sold trays exclusively through Winstrip, Inc. and obtained U.S. Design Patent No. D361,356. (FAC ¶ 31.) This Design Patent registered at the USPTO on August 5, 1997 and was given

Registration No. D381,933. (*Id.*) The Design Patent claimed, "The ornamental design for a plant growing container, as shown and described." (*Id.*) After the patent expired on August 5, 2011, ownership of the design and related goodwill transferred to Neversink Tools LLC in 2018 and subsequently to Subversive Tools in 2023. (*Id.* ¶¶ 33–34.) The tray has been manufactured and sold continuously for nearly thirty years. (*Id.* ¶ 35.)

The WINSTRIP® Trade Dress is alleged to be non-functional. (FAC ¶ 18.) The diagonal orientation of the cells and air spaces is described as ornamental, providing no operational advantage and not affecting the product's manufacturing cost, quality, or performance. (*Id.*) More specifically, the durability and weight of the trays are determined by the type of plastic used, and trays of similar material and size exhibit the same strength and cell capacity regardless of surface pattern. (*Id.* ¶¶ 26–27.) The WINSTRIP® configuration also does not reduce manufacturing cost or increase efficiency, as similar injection-molded trays are produced using comparable materials and methods. (*Id.* ¶¶ 28–29.)

In the nursery-tray industry, it is alleged that manufacturers traditionally design their own distinctive top-down layouts to distinguish their products from competitors. (*Id.* ¶ 15.) In fact, competitors could allegedly design trays with alternative top layouts—such as squares, circles, stars, or octagons— that would achieve identical air-pruning results. (*Id.* ¶¶ 19–21.) The diversity in top layouts is because the airflow that enables root pruning occurs through openings at the bottom of the tray, where the roots are located, rather than from the top pattern. (*Id.* ¶ 20.) As a result, the orientation of cells and air gaps does not influence airflow or pruning effectiveness. (*Id.*) Plaintiff's testing using third-party trays and 3D-printed prototypes confirms that there are no measurable differences in seedling size, airflow, or tray strength between the WINSTRIP® configuration and other alternative designs. (FAC ¶¶ 22–23.) Comparable trays were found to have the same ratio of air openings to cells, indicating that functionality does not depend on the diagonal layout. (*Id.* ¶¶ 24–25.)

3

Over the years, the WINSTRIP® tray has appeared in horticultural publications and online media. (FAC ¶ 36.) A 1999 University of Florida study compared WINSTRIP® trays with other propagation systems; a 2015 Fifth Season Garden Co. article highlighted their reuse potential; and numerous YouTube and social-media videos between 2019 and 2023 have featured side-by-side reviews of WINSTRIP® trays and competing products. (*Id*. ¶¶ 36–39.) Plaintiff also alleges that it has achieved substantial sales of goods bearing the WINSTRIP® Trade Dress and has invested significant resources in advertising and promoting its products under that distinctive configuration. (*Id*. ¶ 40.) Within the small-farm and market-gardening community, the diagonal-cell design has allegedly become closely associated with the WINSTRIP® brand. (*Id*. ¶ 61.) According to Plaintiff, this long-term use—combined with unsolicited media attention, sustained sales, and promotional efforts—has caused the WINSTRIP® Trade Dress to acquire secondary meaning in the marketplace. (*Id*.)

Against this backdrop, Bootstrap, a Pennsylvania-based company, also manufactures and sells propagation equipment, including air-pruning trays, in direct competition with Subversive. (FAC ¶¶ 41–42.) In or around March 2022, Bootstrap introduced an air-prune propagation tray that incorporates the same diagonal arrangement of square planting cells and air openings that define the WINSTRIP® Trade Dress. (*Id*. ¶¶ 43–45.) Specifically, the relative proportions of the cells and air gaps, the diagonal orientation, and the square geometry of the openings, gives Bootstrap's tray an overall appearance that Plaintiff alleges is substantially identical to the WINSTRIP® design. (*Id*.) A side-by-side comparison of Plaintiff's WINSTRIP® tray and Defendant's air pruning tray is shown below:



(Compl. ¶ 30.)

Bootstrap marketed its tray through its website and social-media platforms. (FAC ¶ 46-48.) In a YouTube video titled *The History of Air Pruning and Soil Blocks*, a company representative from Bootstrap described the product as "our own version of the iconic Wingerden design." (*Id.* ¶ 47.) Plaintiff alleges that this statement is evidence that Bootstrap was aware of the design's origin and intended to emulate it. (*Id.*) During the same period, Bootstrap's online advertising appeared in search results for "WINSTRIP tray" and related terms. (*Id.* ¶ 48.) The FAC alleges that this occurred by using the protected WINSTRIP® trademark and variations in website metadata, Google AdWords, and Amazon search listings, causing Bootstrap's products to appear among the top results for searches referencing Plaintiff's trays. (*Id.* ¶ 48 & Ex. F.) Plaintiff lastly highlights that Bootstrap offers other non-infringing air-pruning trays that perform the same function, suggesting that the adoption of the diagonal configuration was not necessary for performance. (*Id.* ¶ 50.)

In light of the above, Subversive contends that Bootstrap's tray competes directly with its WINSTRIP® product, and that the similar configuration is likely to cause consumer confusion as to source or affiliation. (FAC ¶¶ 51–52, 56.) It further alleges that Bootstrap's use of the design was willful and deliberate, undertaken with knowledge of Subversive's trade dress. (*Id.* ¶¶ 53–54.) Bootstrap disputes Subversive's allegations and argues that the WINSTRIP® configuration is functional and therefore unprotectable. (Def. Mem. at 9–13.) Bootstrap further contends that the asserted trade dress merely

5

describes generic industry features and that recognizing it here would improperly restrict legitimate competition in the air-pruning tray market. (*Id*. at 14–16.)

### B. Procedural History

On August 7, 2023, Plaintiff commenced this action against Defendant, asserting claims for trade-dress infringement under § 43(a) of the Lanham Act, trade dress dilution under 15 U.S.C. § 1125(a), trade-dress dilution under N.Y. Gen. Bus. Law § 360-l, and common-law unfair competition. (*See generally* Compl.) On January 2, 2024, Defendant filed a motion to dismiss and corresponding memorandum of law in support (ECF Nos. 18 & 20.) Plaintiff filed an opposition to the motion (ECF No. 21) and the Defendant filed its reply. (ECF No. 22.)

On September 4, 2024, the Court granted Defendant's first motion to dismiss, holding that Plaintiff had failed to plausibly allege that its claimed trade dress was non-functional. (*See* Opinion & Order, ECF No. 23.) The Court dismissed the federal claim without prejudice and declined to exercise supplemental jurisdiction over the state-law claims. (*Id.*)

Plaintiff thereafter filed its operative First Amended Complaint on October 18, 2024, adding detailed allegations concerning the tray's design, functional alternatives, and marketplace recognition. (*See Generally* FAC.) Defendant moved to dismiss the FAC on February 28, 2025 and filed a corresponding memorandum of law in support. (Mot. & Def. Mem., ECF Nos. 31 & 33.) Plaintiff opposed (Opp., ECF No. 34) and Defendant replied (Reply, ECF No. 35).

## LEGAL STANDARD

### A. Rule 12(b)(6) Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." (*Id*. at 679.) While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." (*Id*. at 678) (quoting *Twombly*, 550 U.S. at 555). The Second Circuit "deem[s] a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . . and documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rotham v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (internal citations omitted). The critical inquiry is whether the Plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A motion to dismiss will be denied where the allegations "allow[] the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Additionally, Courts may take judicial notice of certain publicly available documents. *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (noting that courts may "look to public records, including complaints filed in state court, in deciding a motion to dismiss"). The Court may take judicial notice of official records from the United States Patent and Trademark Office and the United States Copyright Office. *See Island Software and Comput. Serve., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) (copy right registration); *Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1096 n.2 (8th Cir. 1996 (trademark registration).

## DISCUSSION

Plaintiff brings claims under the Lanham Act, New York General Business Law § 360-l, and New York common law. For the reasons stated below, the Court DENIES Defendant's motion to dismiss as to

Plaintiff's Lanham Act trade-dress infringement claim, common-law unfair-competition claim, and state dilution claim. The Court GRANTS the Defendant's motion as to Plaintiff's federal dilution claim which is dismissed without prejudice.

### A. Trade Dress Infringement Under the Lanham Act

Plaintiff has plausibly stated a claim for trade-dress infringement under § 43(a) of the Lanham Act. To state a claim for trade dress infringement under the Lanham Act, a party must plead "'(1) the claimed trade dress is non-functional; (2) the claimed trade dress has secondary meaning; and (3) there is a likelihood of confusion between the plaintiff's goods and the defendant's.'" *Deckers,* 2024 WL 3459609, at *3.

i.      Non-functionality

Plaintiff sufficiently pleads that the WINSTRIP® configuration is non-functional. A feature is functional only if it is "essential to the use or purpose of the article", "affects the cost or quality of the article", or if it puts competitors at a significant non-reputational, competitive disadvantage. *See TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001). Features serving primarily aesthetic or source-identifying purposes are non-functional. *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995). Notably, the determination of trade-dress functionality is fundamentally a question of fact. *Telebrands Corp. v. Del Labs., Inc.*, 719 F. Supp. 2d 283, 299 (S.D.N.Y. 2010). "Because functionality is a question of fact, it is often premature to conclude that a plaintiff has failed to establish functionality at the motion to dismiss stage." *Caraway Home, Inc. v. Pattern Brands, Inc.,* No. 20 CIV. 10469, 2021 WL 1226156, at *9 (S.D.N.Y. Apr. 1, 2021). Thus, even before applying the multi-factor analysis, the pleadings alone make dismissal on functionality grounds inappropriate.

Even assuming the Court were to conduct the functionality analysis at this early stage, Plaintiff's allegations are sufficient. Plaintiff's amended complaint does more than simply assert bare, conclusory

statements of non-functionality, as Defendants argue. (Def. Mem at 11-12.) The FAC isolates the design feature at issue—the twenty-nine to thirty-one-degree diagonal top layout of the tray—and alleges that it plays no role in the functional mechanisms that make an air-pruning tray operate. (FAC ¶ 17.) Specifically, Plaintiff alleges that the tray's airflow occurs through bottom openings, that structural strength derives from the tray's plastic composition, and that seedling viability depends on cell volume rather than surface orientation like the tray's diagonal configuration. (*Id*. ¶¶ 18–29.) To support these assertions, Plaintiff cites to the comparative testing it conducted using competitor trays and 3D-printed prototypes. (*Id*. ¶¶ 22–24.) This testing revealed no measurable differences in airflow, root pruning, durability, or seedling growth when the diagonal orientation was altered or removed. (*Id*.) By separating how the product functions from how the top surface appears, Plaintiff plausibly alleges that the claimed design is not utility driven. Courts have held that such factual allegations are sufficient at the pleading stage. *Deckers Outdoor Corp. v. Next Step Grp., Inc.*, No. 23-CV-02545 (ALC), 2024 WL 3459609, at *3 (S.D.N.Y. July 18, 2024); *GeigTech E. Bay LLC v. Lutron Elecs. Co*., 352 F. Supp. 3d 265, 282 (S.D.N.Y. 2018). At a later stage such as summary judgment, Plaintiff will have the opportunity to substantiate these allegations with admissible evidence, including the comparative testing data it claims to have conducted.

The FAC also alleges that numerous alternative top-surface configurations—including vertical, staggered, circular, honeycomb, and other geometries—achieve the same functional results. (FAC ¶¶ 22–26.) Defendant argues that alternative designs are irrelevant to non-functionality, but that misstates the law. (Def. Mem. at 11.) The availability of equally effective alternatives, while not dispositive is probative of non-functionality in design-based trade dress cases. *Schutte Bagclosures Inc. v. Kwik Lok Corp.,* 193 F. Supp. 3d 245, 270 (S.D.N.Y. 2016), *aff'd*, 699 F. App'x 93 (2d Cir. 2017) ("The existence of actual or potential designs that work equally well strongly suggests that the particular design … is not needed by competitors to effectively compete.") At this stage, the Court need only determine whether the FAC

plausibly alleges a non-functional, source-identifying design—not weigh competing factual assertions. *Telebrands,* 719 F. Supp. 2d at 301 (factual claims regarding functionality cannot be resolved on a motion to dismiss). Defendant's remaining challenges—that the diagonal orientation appears in an expired patent or that the design is "generic" within the industry (Def. Mem. at 10-12)—also raise factual disputes that cannot be resolved on a motion to dismiss. *See Telebrands,* at 301.

Taken together, Plaintiff's allegations form a coherent, plausible theory: the diagonal layout contributes to the tray's visual identity—not its function. The FAC asserts specific technological reasons why the WINSTRIP® Trade Dress's layout does not drive performance and is non-functional, provides data alleging functional equivalence with alternative designs, and highlights the elements of the trade dress. Accordingly, accepting the allegations as true, Plaintiff has plausibly alleged non-functionality and thus satisfied the first element of its Lanham Act trade-dress infringement claim.

ii.   Secondary Meaning

Having successfully pleaded non-functionality, the Court next considers whether Plaintiff has plausibly alleged that the WINSTRIP® Trade Dress has acquired secondary meaning within its relevant market. Courts consistently emphasize that the question of secondary meaning is fact-intensive and therefore not suited for resolution at the motion-to-dismiss stage. *Gross v. Bare Escentuals Beauty, Inc.*, 632 F. Supp. 2d 283, 291 (S.D.N.Y. 2008) ("determining secondary meaning is a fact-intensive inquiry"); *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 316 (S.D.N.Y. 2012) ("Whether a mark has acquired secondary meaning is a factual determination, proof of which entails vigorous evidentiary requirements.") For this reason, courts routinely decline to dismiss trade-dress claims at the pleadings stage. *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 212–13 (S.D.N.Y. 2015); *see also CourtAlert.com, Inc. v. e-Law, LLC,* No. 12 Civ. 2473(DAB), 2013 WL 4754819, at *6 (S.D.N.Y. Aug. 26, 2013) (whether mark had secondary meaning presented a question of

fact that could not be decided on a motion to dismiss.) This principle is particularly strong where, as here, discovery has not yet occurred. *See Metrokane, Inc. v. Wine Enthusiast*, 160 F. Supp. 2d 633, 640 (S.D.N.Y. 2001) (assuming secondary meaning on a motion to dismiss because "no discovery has yet been conducted"). Accordingly, the Court DENIES Defendant's challenge to secondary meaning on this basis alone.

Even so, the allegations—taken as true—also substantively support a plausible inference of secondary meaning under the traditional six factors. A trade dress acquires secondary meaning when "in the minds of the public, the primary significance of a product feature is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982). Courts assess six factors: "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) length and exclusivity of the mark's use." *U-Neek, Inc. v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 158, 172 (S.D.N.Y. 2001) (citing *Centaur Communications Ltd. v. A/S/M Communications Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987)). No single factor is dispositive. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 117 F. Supp. 2d 360, 366 (S.D.N.Y. 2000).

Plaintiff plausibly alleges several factors that favor a finding of secondary meaning at the pleading stage. The FAC asserts almost thirty years of continuous and exclusive use of the WINSTRIP® configuration since 1995 with ownership passing through a single lineage. (FAC ¶¶ 31–35.) Courts consistently find similar periods significant. *See Landscape,* 117 F. Supp. 2d at 367 (use since 1989 indicative of secondary meaning); *Cartier*, 348 F. Supp. 2d at 244 (twenty plus years of uninterrupted use weighed strongly in favor of secondary meaning). Plaintiff further alleges that the WINSTRIP® tray has received substantial public exposure through trade publications, academic studies, and online media. (FAC ¶¶ 36–39.) This includes a 1999 University of Florida study, a 2015 Fifth Season Garden Co. article, and

numerous YouTube videos between 2019 and 2023 comparing WINSTRIP® trays to competing products, screenshots of which are included in the FAC. (*Id.*) Such unsolicited press supports the inference that consumers and industry participants associate the tray's distinctive diagonal-cell appearance with a single producer. *See Centaur* at 1222 (unsolicited media coverage weighs in favor of secondary meaning).

 Similarly, Plaintiff claims the WINSTRIP® Trade Dress has acquired secondary meaning in the marketplace partially due to its high volume of sales of products bearing the WINSTRIP® Trade Dress, and significant advertising efforts. (FAC ¶ 61.) While Plaintiff does not provide dollar figures, courts have held that general allegations of sustained promotional efforts and sales are sufficient at the motion-to-dismiss stage, particularly where, as here, the trade dress has been on the market for decades. *Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 350 (S.D.N.Y. 2014) (rejecting dismissal despite plaintiffs providing no advertising amounts because such allegations cannot be dismissed at this stage.); *A.V.E.L.A.*, 131 F. Supp. 3d at 213 (allegations of "significant sales" adequate on a motion to dismiss). Therefore, advertising expenditures and sales success both weight in Plaintiff's favor at this stage.

 Plaintiff further alleges that Bootstrap sought to appropriate the WINSTRIP® Trade Dress. (FAC ¶ 47.) According to the FAC, Defendant released a YouTube video describing its tray as "our own version of the iconic Wingerden design," and the tray is alleged to closely mirror the diagonal-cell configuration of Subversive's WINSTRIP® tray. (FAC ¶¶ 45–47, Ex. A.) However, whether these statements and similarities reflect intentional copying—or instead reflect ordinary competitive behavior—is a fact-intensive question that cannot be resolved on a motion to dismiss. *Hearts on Fire Co., LLC v. L.C. Int'l Corp.*, 2004 WL 1724932, at *4 (S.D.N.Y. July 30, 2004) (allegations of willful copying suffice at pleading stage because determinations of bad faith are factual inquiries inappropriate on a motion to dismiss.) While deliberate imitation can support secondary meaning, the relevant question is whether copying was done "to benefit from the plaintiff's name and goodwill." *Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 838

F. Supp. 2d 141, 12 (S.D.N.Y. 2011). The current allegations do not clearly establish such intent, and any inference of deliberate copying is speculative at this stage and better suited for resolution after discovery. Lastly, Plaintiff does not offer consumer survey evidence linking the mark to a source. Although this omission weighs against secondary meaning, the lack of surveys is not fatal because not every factor "must be proved to make a showing of secondary meaning." *Landscape,* 117 F. Supp. 2d at 366.

In sum, because several factors weigh affirmatively in Plaintiff's favor (length and exclusivity of use, advertising expenditures, sales success, and unsolicited media coverage), the overall balance plausibly supports secondary meaning at this stage.

iii.   Likelihood of Confusion

Having adequately alleged non-functionality and secondary meaning, the Court turns to the third and final element of trade-dress infringement: likelihood of confusion. As with secondary meaning, assessing confusion requires application of the *Polaroid* factors—an inquiry that entails fact-specific determinations not suitable for resolution on a motion to dismiss. *Hearts on Fire Co., LLC v. L C Int'l Corp.*, No. 04-CIV-2536, 2004 WL 1724932, at *4 (S.D.N.Y. July 30, 2004). Given this principle alone, Defendant's challenge could be denied at this stage.

Even so, the allegations still plausibly suggest a likelihood of confusion under *Polaroid*. Likelihood of confusion exists where "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 383 (2d Cir. 2005). Courts assess this question under the eight *Polaroid* factors: "(1) the strength of the plaintiff's trade dress; (2) the similarity between the two trade dresses; (3) the proximity of the products in the marketplace; (4) the likelihood that the prior owner will 'bridge the gap'; (5) evidence of actual confusion; (6) the defendant's good or bad faith; (7) the quality of the defendant's product; and (8) the sophistication of the buyers." *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).

Several factors affirmatively favor Plaintiff. First, the strength of the WINSTRIP® trade dress is plausibly more than minimal within the specialized small-farm and greenhouse market. Plaintiff alleges nearly three decades of continuous use, consistent design presentation, and recognition among agricultural professionals and small-farm growers—precisely the type of industry-specific distinctiveness courts consider relevant when evaluating trade-dress strength in specialized markets. (FAC ¶¶ 31–35.); *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.,* 440 F. Supp. 2d 249, 275 (S.D.N.Y. 2006). Second, the similarity between the two trade dresses is substantial. Plaintiff pleads that Defendant's tray mirrors the WINSTRIP® configuration with the same diagonal orientation, cell geometry, row alignment, and overall visual impression. (FAC ¶¶ 41–45 & Ex. A.)  The initial Complaint also provides side-by-side photographic comparisons of the Subversive and Bootstrap trays, illustrating what appears to be a near one-to-one replication of Subversive's surface grid. (Compl. ¶ 30.) Courts have recognized that when competing designs convey the same overall visual impression, minor variations do not defeat similarity for purposes of the likelihood-of-confusion inquiry. *Romm Art Creations Ltd. v. Simcha Int'l, Inc.*, 786 F. Supp. 1126, 1137–38 (E.D.N.Y. 1992) (finding that works creating the "same overall impression" supported likelihood of confusion) (quoting *Paco Rabanne Parfums, S.A. v. Norco Enters., Inc.*, 680 F.2d 891, 893 (2d Cir. 1982)). As a result, the similarity between the two trade dresses is substantial.

Third, market proximity strongly supports Plaintiff. Courts find the proximity factor satisfied where the parties sell their products "through the same channels of trade to the same class of customers." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996). Here, both trays are sold through the same channels—online retailers, e-commerce platforms, and agricultural supply sites—and target the same purchasers: small-farm growers, greenhouse operators, and horticultural professionals, seeking reusable air-pruning equipment. (FAC ¶¶ 7–9, 41–48.) As both products are positioned as substitutes for

14

one another, marketed for the same use, purchased by overlapping consumers, and offered in the same purchasing environment, these circumstances materially heighten the risk of confusion.

Notably, the bad-faith factor cannot be resolved at this stage because it turns on disputed issues of intent that are inappropriate for adjudication on a Rule 12(b)(6) motion. As discussed above in the context of secondary meaning, the question of Defendant's intent—including whether its references to the "iconic Wingerden design" or its alleged metadata usage were attempts to trade on Plaintiff's goodwill—is a fact-intensive inquiry inappropriate for resolution on a Rule 12(b)(6) motion. *Coastal Inv. Partners, LLC v. DSG Glob., Inc.,* No. 17 CIV. 4427 (DAB), 2018 WL 2744719, at *5 (S.D.N.Y. June 6, 2018). Bootstrap may dispute the meaning, context, or significance of those statements, but evaluating whether such conduct reflects an intention to capitalize on Plaintiff's goodwill—or merely an effort to reference a common industry design—is a factual determination reserved for trial. *Andrew Jergens Co. v. Bonded Prods. Corp.,* 9 F.2d 114, 116 (E.D.N.Y. 1925). Accordingly, the bad-faith factor is neutral at this stage both because intent cannot be adjudicated on the pleadings and because discovery is required to resolve the parties' competing interpretations of Defendant's conduct.

The remaining *Polaroid* factors are likewise neutral. First, there is no allegation of actual confusion. Second, because the parties directly compete by offering the same type of air-pruning trays to the same consumer base, the "bridge the gap" factor is irrelevant. The quality factor is neutral as well, as the FAC does not allege that Defendant's trays are inferior or defective in a way that would exacerbate confusion. And although professional growers may be relatively sophisticated purchasers, that sophistication does not eliminate the possibility of confusion given the trays' highly similar appearance in online marketplaces; accordingly, this factor is best treated as neutral at this stage.

On balance, the strength, similarity, and proximity factors weigh in favor of likely confusion, while bad faith and the remaining factors are neutral. Taken together, these considerations sufficiently support

15

a plausible likelihood-of-confusion allegation at the pleading stage. Accordingly, because Plaintiff plausibly alleges that the WINSTRIP® Trade Dress is non-functional, has acquired secondary meaning, and is likely to be confused with Defendant's nearly identical product, Defendant's motion to dismiss Plaintiff's Lanham Act trade-dress infringement claim is DENIED.

### B. Trade-Dress Dilution (15 U.S.C. § 1125(c))

Plaintiff fails to state a claim for trade dress dilution. Under the Lanham Act, "the person who asserts trade dress protection has the burden of proving that – the claimed trade dress, taken as a whole, is not functional and is famous." *DO Denim, LLC v. Fried Denim, Inc.*, 634 F. Supp. 2d 403, 408 (S.D.N.Y. 2009). "A trademark is famous for dilution purposes only 'if it is widely recognized by the *general consuming public* of the United States as a designation of source of the goods or services of the mark's owner." *Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 193 F. Supp. 3d 245, 283 (S.D.N.Y. 2016), *aff'd*, 699 F. App'x 93 (2d Cir. 2017) (quoting 15 U.S.C. § 1125(c)(2)(A)). Moreover, "[o]nly trademarks that enjoy such broad renown so as to at least approach (if not attain) the status of 'household names' may qualify as famous marks under federal law." (*Id.*) Courts have held that "niche fame" among a specific marketplace or group of consumers is insufficient and the general public itself must associate the trademark at issue with the trademark owner." (*Id.*)

Plaintiff's federal trade-dress dilution claim cannot survive because the pleadings do not plausibly allege that the WINSTRIP® trade dress is "famous" under the Lanham Act. By Plaintiff's own allegations, recognition of the trade dress is limited to a specialized group of professional growers, greenhouse operators, and small-farm practitioners. (FAC ¶¶ 7–9, 36–39, 61.) While the product may enjoy long-standing goodwill in that field, professional familiarity does not establish the broad consumer awareness required for federal dilution protection. Courts in this Circuit consistently reject dilution claims where the mark's prominence is confined to a particular trade or niche market. *See Schutte* 193 F. Supp. 3d at 283

16

(brand well known in packaging industry not "famous" among general public); *Luv N' Care Ltd. v. Regent Baby Prods. Corp.,* 841 F.Supp.2d 753, 757 (S.D.N.Y.2012) (dismissing dilution claim on a 12(b)(6) motion because plaintiff's marks were only famous within a niche, not among the general consuming public); *Boarding Sch. Review, LLC v. Delta Career Educ. Corp.*, No. 11–cv–8921, 2013 WL 6670584, at *7 (S.D.N.Y. Mar. 29, 2013) (dismissing dilution claim where trademarks were only "recognized within the niche market of for-profit, post-secondary schools.")

The FAC includes no allegation that the general public associates the diagonal-cell design—or the WINSTRIP® name—with a single source. It does not claim national advertising, consumer surveys, or media exposure demonstrating recognition beyond the agricultural sector. (FAC ¶¶ 36–40.); *Schutte* 193 F. Supp. 3d at 283 ("dilution claims based on niche fame, i.e. fame limited to a particular channel of trade, segment of industry or service, or geographic region" are intended to be rejected.) Accordingly, references to the WINSTRIP® name in horticultural publications or online forums merely reflect visibility among practitioners, not the public at large. Because the alleged recognition does not transcend the particular goods or services at issue, the WINSTRIP® design cannot qualify as "famous" under § 43(c). Luv N' Care,841 F.Supp.2d at 757; *see also Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 472 (E.D.N.Y. 2009) (granting motion to dismiss against Lanham Act trade dilution claim where Plaintiff failed to demonstrate its mark was "truly famous.").

Accordingly, Count II for federal trade-dress dilution is DISMISSED without prejudice and Plaintiff is granted leave to amend to allege, on a good faith basis, sufficient facts to support a plausible trade dilution claim under federal law.

### C. Trade Dress Dilution under N.Y. Gen. Bus. Law § 360-1

Subversive states a plausible claim for trade-dress dilution under New York law. To plead dilution under § 360-l, a plaintiff must allege (1) ownership of a distinctive mark and (2) a likelihood of dilution

by blurring or tarnishment. *Schutte*, 193 F. Supp. 3d at 284. Unlike the federal dilution statute, § 360-l does not require that the mark be famous, but it does require the marks to be substantially similar. *Shandong Shinho Food Indus. Co. v. May Flower Int'l, Inc.*, 521 F. Supp. 3d 222, 261–62 (E.D.N.Y. 2021). Courts evaluating blurring consider the *Mead Data* factors, including similarity of the marks, similarity of the products, consumer sophistication, predatory intent, and the relative renown of each mark. *Mead Data Cent., Inc. v. Toyota Motor Sales*, 875 F.2d 1026, 1031 (2d Cir. 1989); *see also Landscape Forms*, 117 F. Supp. 2d at 370 (observing overlap between the *Mead Data* and *Polaroid* analyses.) At the pleading stage, it suffices that the complaint alleges facts "raising the possibility that the mark will lose its ability to serve as a unique identifier." *Fireman's Ass'n of the State of N.Y. v. French-Am. Sch.*, 41 A.D.3d 925, 928 (2d Dep't 2007).

Subversive meets this standard. As previously discussed, the WINSTRIP® Trade Dress is plausibly distinctive by virtue of its decades-long commercial use and its recognition in the horticultural industry. (*See generally* FAC.) The FAC also plausibly alleges a likelihood of dilution: it asserts that Defendant introduced a tray featuring a near-identical diagonal-cell configuration, markets and sells that tray to the same growers and horticultural professionals, and promotes it through the same online channels. (*Id*.) These allegations implicate several *Mead Data* factors—most notably the similarity of the marks and similarity of the products—and readily support a plausible risk of blurring by creating a mental association between the parties' designs.

Given the low pleading threshold, and in light of the Court's earlier conclusion that Plaintiff has plausibly stated a Lanham Act trade-dress claim, these allegations are sufficient to state a claim for dilution under § 360-l. Defendant's motion to dismiss this claim is therefore DENIED.

### D. Unfair Competition Under New York State Common Law

Plaintiff states a plausible claim for unfair competition. Under New York law, the tort of unfair competition is "virtually identical" to trademark infringement the Lanham Act but requires an additional showing of bad faith." *Lopez v. Adidas Am., Inc.*, No. 19-CV-7631 (LJL), 2020 WL 2539116, at *15 (S.D.N.Y. May 19, 2020); *see also Erickson Beamon Ltd. v. CMG Worldwide, Inc.*, No. 12 Civ. 5105 (NRB), 2014 WL 3950897, at *9 (S.D.N.Y. Aug. 13, 2014) ("Because we have found that defendants have stated a claim for unfair competition under Section 43(a), the only remaining question is whether defendants have adequately pled that plaintiff acted in bad faith."); *SLY Mag., LLC v. Weider Publ'ns*, 529 F. Supp. 2d 425, 443 (S.D.N.Y. 2007) (Lanham Act and New York unfair-competition claims rise and fall together.). While "bad faith" under the Lanham Act is one of several *Polaroid* factors considered in determining likelihood of confusion, under New York common law it is an independent and indispensable element. *Erickson,* 2014 WL 3950897, at 9.

Because the Court has already found the Lanham Act claim adequately pleaded, the remaining issue is whether Plaintiff has plausibly alleged bad faith. Plaintiff has done so. He alleges conduct that, if proven, could reflect an intent to exploit Plaintiff's goodwill, and whether that intent existed—as opposed to mere ordinary competition—is a fact-intensive question not suitable for resolution on a motion to dismiss. *Pulse Creations, Inc. v. Vesture Grp.*, 154 F. Supp. 3d 48, 58 (S.D.N.Y. 2015) (bad-faith determinations are premature at dismissal).Courts consistently hold that inquiries into intent "necessarily entail a factual inquiry" inappropriate at the pleading stage. *Castle Rock Entm't v. Carol Publ'g Grp., Inc.*, 955 F. Supp. 260, 274 (S.D.N.Y. 1997), aff'd, 150 F.3d 132 (2d Cir. 1998); *see Pulse,* 154 F. Supp. 3d at 58. For the same reason that issues of secondary meaning and likelihood of confusion could not be resolved on the pleadings, the question of bad faith must await a fuller record. Because Plaintiff has alleged facts that, if proven, could support a finding of bad faith—and because New York unfair-competition

claims rise and fall with Lanham Act claims—Defendant's motion to dismiss the unfair-competition claim is DENIED.

## CONCLUSION

For the foregoing reasons, Defendant Bootstrap Farmer, LLC's Motion to Dismiss the First Amended Complaint is GRANTED in part and DENIED in part. Plaintiff Subversive Tools, Inc. has plausibly stated a claim for trade-dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), trade-dress dilution under N.Y. Gen. Bus. Law § 360-l (Count III), and unfair competition under New York common law (Count IV). Accordingly, Defendant's motion to dismiss Count I, Count III, and Count IV is DENIED. However, Plaintiff's claims for federal trade-dress dilution (Count II) is DISMISSED without prejudice, and Plaintiff is granted leave to file a Second Amended Complaint ("SAC"). If Plaintiffs choose to file a SAC, they must do so by December 15, 2025. Defendants shall answer or otherwise respond by January 5, 2026. If Plaintiffs fail to timely amend and cannot show good cause for such failure, any claims dismissed without prejudice herein may be deemed dismissed with prejudice. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 31.

Dated: November 19, 2025
White Plains, New York

SO ORDERED:

NELSON S. ROMÁN
United States District Judge